UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DOROTHY M. SCHWARTZ,           :
                               :
          Plaintiff            :     No. 3:12-CV-01070
                               :
     vs.                       :     (Judge Kane)
                               :
CAROLYN W. COLVIN, ACTING      :
COMMISSIONER OF SOCIAL         :
SECURITY,                      :
                               :
          Defendant            :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") which was only partially favorable to Plaintiff Dorothy M. Schwartz's claim for social security disability insurance benefits and supplemental security income benefits.

        Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Schwartz met the insured status requirements of the Social Security Act through June 30, 2009. Tr. 18, 20 and 68.[1] In order to establish entitlement to disability insurance benefits

_____

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant on August 14, 2012.

Schwartz was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Schwartz was born on June 14, 1980. Tr. 24, 60-61 and 73. She claims that she became disabled on June 14, 2004, because of several psychiatric disorders. Tr. 40. She does not contend that she is disabled as the result of physical impairments.

Schwartz graduated from high school and has past relevant work as a cashier, sales associated and stock clerk for Boscov's Department Store; a childcare aide; a cashier and attendant at an amusement park; and a dishwasher and salad maker at a restaurant. Tr. 97 and 722. All of Schwartz's prior relevant employment is classified as unskilled, light-duty work. Tr. 722.[2]

_____

2.  Past relevant work experience in the present case means work performed by Schwartz during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. The terms sedentary and light work are defined in the Social Security regulations as follows:

            (a) *Sedentary work*. Sedentary work involves lifting no
            more than 10 pounds at a time and occasionally lifting
                                                      (continued...)

The records of the Social Security Administration reveal that Schwartz had earnings in the years 1997 through 2004. Tr. 69. Schwartz's reported annual earnings ranged from a low of $73.53 in 1997 to a high of $11,496.70 in 2003. Id.  Schwartz's total earnings during those 8 years were $42,248.68. Id.  Schwartz has not engaged in any substantial gainful activity since June 14, 2004, the alleged onset date of her disability.  Tr. 20.

---

2.   (...continued)
or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567 and 416.967.

On March 8, 2005, Schwartz filed protectively[3] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 60-67. The applications were initially denied by the Bureau of Disability Determination[4] on September 14, 2005. Tr. 40-44. On October 19, 2005, Schwartz requested a hearing before an administrative law judge. Tr. 45.  On November 15, 2007, a hearing was held before an administrative law judge. Tr. 709-728.[5]  On February 7, 2008, the administrative law judge issued a decision denying Schwartz's applications for benefits. Tr. 18-25.[6]  On March 7, 2008, Schwartz filed a request for review of the decision with the Appeals Council of the Social Security Administration. Tr. 11 and 14.  On December 4, 2009, the Appeals Council concluded that there was no

---

3.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4.  The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 41.

5.  The delay in holding an administrative hearing was in part the result of Schwartz on January 17, 2006, withdrawing her request for a hearing and then on December 4, 2006, reinstating her request for a hearing.  Tr. 38-39 and 53-54.

6.  Schwartz on the date of the hearing before the administrative law judge and on the date of the administrative law judge's decision was 27  years old.  Schwartz was considered a "younger individual" under the Social Security regulations which define that term as "an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

basis upon which to grant Schwartz's request for review. Tr. 5-8. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Schwartz then filed on January 25, 2010,  a complaint in this court requesting that we reverse the decision of the Commissioner denying her disability and supplemental security income benefits. Schwartz v. Astrue, Civil No. 10-00173 (M.D. Pa)(Muir, J.).  On September 1, 2010, that case was remanded by Judge Muir to the Commissioner for further proceedings primarily because the administrative law judge did not make a determination as to whether or not several psychiatric conditions were medically determinable impairments.[7] Id., slip op. at 10-11 (M.D. Pa. September 1, 2010)(Doc. 14).

A second hearing before the same administrative law judge was held on February 11, 2011. Tr. 891-935.  At the administrative hearing Schwartz, a psychologist and a vocational expert testified. Id.  Schwartz was represented by counsel at the hearing. Id.  On March 11, 2011, the administrative law judge issued a decision which in part granted Schwartz's applications for benefits. Tr. 752-769.  The administrative law judge found that Schwartz was under a disability as the result of bipolar

---

7.  The psychiatric conditions not considered by the administrative law judge were chronic paranoid schizophrenia, chronic posttraumatic stress disorder and major depressive disorder.

depression[8] from June 14, 2004, through February 10, 2011, but
that medical improvement occurred on February 11, 2011, which
disentitled her to benefits on and after that date. Tr. 761.

On March 31, 2011, Schwartz filed a request for review
with the Appeals Council of the Social Security Administration's
Office of Disability Adjudication and Review, and after about 14
months had elapsed the Appeals Council on May 17, 2012, concluded
that there was no basis upon which to grant Schwartz's request for
review. Tr. 729-732 and 743-748. Thus, the administrative law
judge's decision stood as the final decision of the Commissioner.

Schwartz then filed a complaint in this court on June 6,
2012.  Supporting and opposing briefs were submitted and the
appeal[9] became ripe for disposition on December 5, 2012, when
Schwartz filed a reply brief.

For the reasons set forth below we will affirm the
Commissioner.

**Standard of Review**

When considering a social security appeal, we have
plenary review of all legal issues decided by the Commissioner.
See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d

---

8.  The administrative law judge found based on the testimony of
a psychologist that the other mental conditions referenced in
Judge Muir's decision of September 1, 2010, were not medically
determinable impairments. Tr. 758.

9.  Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181
F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d
857, 858 (3d Cir. 1995).  However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir.
1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); <u>Cotter
v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71
F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176
(4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

     Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565
(1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197,
229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d
198, 200 (3d Cir. 2008);  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360

(3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful

8

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has

---

10. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

11. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is
(continued...)

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social

_____

11. (...continued)
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

12. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

13. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A
regular and continuing basis contemplates full-time employment and
is defined as eight hours a day, five days per week or other
similar schedule. The residual functional capacity assessment must
include a discussion of the individual's abilities.  Id; 20 C.F.R.
§§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1
("'Residual functional capacity' is defined as that which an
individual is still able to do despite the limitations caused by
his or her impairment(s).").

**Medical Records**

        Before we address the administrative law judge's
decision and the arguments of counsel, we will review some of
Schwartz's medical records. The following review of the medical
records is based to a great extent upon the undisputed statements
of material fact submitted by Schwartz and the Commissioner's
submission of additional medical facts. Docs. 7 and 11.

        On June 14, 2004, Schwartz was voluntarily admitted to
the Pottsville Hospital in Pottsville, Pennsylvania. When she was
admitted she was confused and agitated. Tr. 118-121.  She had a
history of chronic depression and had recently become dramatically
more depressed. Id.  A mental status examination revealed that she
was delusional; she was very suspicious, guarded and evasive; her
speech was scattered and rambling; her mood was depressed and her
affect constricted; her eye contact was poor and facial expression
tense; her insight and judgment were poor; and psychomotor

agitation was observed. Id.  On admission Schwartz was diagnosed as suffering from schizophrenia, paranoid type, major depressive disorder with psychosis, and dysthymic disorder, early onset.  Tr. 120.

Saverio N. Laudadio, D.O., a psychiatrist, who performed an evaluation of Schwartz during her hospitalization, noted that two days after admission, Schwartz claimed she was feeling "wonderful" and wanted to leave because she felt trapped, like a prisoner. Tr. 133.  Dr. Laudadio observed that Schwartz's speech was pressured, rambling and scattered. Id.  Her mood was labile, facial expressions tense, and eye contact poor.  Psychomotor agitation was observed. Id.  On June 18, 2004, Schwartz was discharged from the hospital against medical advice with a primary diagnosis of paranoid schizophrenia, chronic/exacerbation, and a secondary diagnosis of neurotic depression.  Tr. 118.[14]

On June 19, 2004, the next day, Schwartz was involuntarily admitted to the Pottsville Hospital for disorganized behavior and agitation. Tr. 151 and 155-156.  Her family brought her back to the hospital because she was talking constantly, not sleeping, and hallucinating. Id.  This time she remained in the hospital for ten days. Id.  On admission, Schwartz was very agitated, loud, paranoid, and delusional. Id.  Her Global

---

14.  During this stay Schwartz made several unusual statements. She stated that she was in the Navy in 1994, at a time when she was 14 years of age. Tr. 119.  She also stated she was in prison for 9 years and then stated "24 years, all of my life." Tr. 119.

Assessment of Functioning (GAF) score on admission was 5 and on discharge it was 45-50.[15] Tr. 151.

On September 1, 2004, Schwartz underwent a psychiatric evaluation by Dr. Laudadio. Tr. 203-206.  The diagnosis on that date was that Schwartz suffered from schizoaffective disorder; posttraumatic stress disorder, chronic; adjustment disorder with

_____

15.  The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 1 to 10 denotes a persistent danger of severely hurting oneself or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death. Id. A GAF score of 11 to 20 represents some danger of hurting self or others or occasionally fails to maintain minimal personal hygiene or gross impairment in communication. Id.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

mixed emotional and behavioral features; and psychosis, not otherwise specified. Id.

On September 29, 2004, Schwartz was evaluated by Paul Brettschneider, M.D., at Hershey Medical Center. Tr. 340-343. The diagnosis on that date was psychotic disorder, not otherwise specified, rule out bipolar disorder; rule out schizophrenia; rule out major depression with psychosis.[16] Id. Dr. Brettschneider gave Schwartz a GAF score of 50. Tr. 342.

On October 21, 2004, Dr. Brettschneider after conducting an examination of Schwartz noted unremarkable mental status examination findings and gave her a GAF score of 55 to 60, representing moderate symptomatology. Tr. 338-339. In November and December, 2004, Dr. Brettschneider gave Schwartz GAF scores of 65 and 65 to 70, respectively. Tr. 336-337. At the appointment in December, Dr. Brettschneider noted that Schwartz was doing fine without medication. Tr. 336.

On Wednesday, June 29, 2005, Schwartz was admitted to the Pottsville Hospital at her husband's request after visiting the emergency department of that facility. Tr. 211. Schwartz had been married the previous Saturday and had not slept in the four

---

16. The "rule-out" diagnosis is used inconsistently by different physicians and psychologists and the context in which the "rule-out" diagnosis is made has to be closely scrutinized. The "rule-out" diagnosis can have two different meanings. It can mean that the particular condition is in fact ruled out, i.e., the patient is not suffering from the condition, but it also can mean that further information is needed to evaluate whether the patient is in fact suffering from the condition.

days since then. Id.  In the emergency department she was observed
"banging her head off the walls." Id.  She was diagnosed as
suffering from major depressive disorder and possibly reactive
psychosis.  Tr. 212. She was given a GAF score of 20. Id.
Schwartz was discharged from the hospital into the care of her
husband on July 1, 2005, against medical advice. Tr. 214-215.

      Schwartz was re-admitted to the Pottsville Hospital
because of delusions and severe agitation on July 3, 2005, and
remained hospitalized for eleven days. Tr. 249-251.  At the time
of admission she was given a GAF score of 10. Tr. 254.  A urine
drug screen at the time of admission revealed that she had
consumed marijuana. Tr. 248 and 253.  During this hospitalization
medications were tried and adjusted and she responded well to
Zoloft. Tr. 249-250.  At discharge on July 14, 2005, she was alert
and oriented to person, place and time; her mood was suppressed
with anxious affect but responsive; her constructive thought
processes were goal directed; she spoke softly and maintained good
eye contact; she denied any auditory or visual hallucinations; and
she denied any suicidal or homicidal ideations. Tr. 250.

      On July 28, 2005, Schwartz had an appointment with Dr.
Brettschneider who noted that the stress of Schwartz's wedding and
threats from an ex-boyfriend had caused her to relapse. Tr. 334-
335.  She was taking Zoloft, Zyprexa and Depakote but reported
that they caused dizziness, increased appetite, and stomach upset.
Id. A mental status examination revealed that she had an irritable

mood and a labile affect. Id.  She was resistant to her mental illness diagnosis and need for medications. Id.  The diagnosis was psychotic disorder; rule out bipolar disorder; rule out depressive disorder. Id.  Her GAF score was 50. Id. She was told to take her medications at night in order to try to diminish the side effects. In a follow-up appointment with Dr. Brettschneider on August 25, 2005, Schwartz's mood was upset and she was angry in a childlike way. Tr. 333.  The diagnostic impression was psychotic disorder, not otherwise specified and she was given a GAF score of 60. Id.

Schwartz had appointments with Dr. Brettschneider in October and November, 2005, and February, March, April and June 2006. Tr. 570-576.  Schwartz continued to be treated with medications. Id.  Her diagnosis remained the same and she was given GAF scores ranging from 60 to 70. Id.

On July 6, 2006, Dr. Brettschneider noted that Schwartz was hospitalized from June 28, 2006, through July 3, 2006, after decompensating at home, perhaps because of the stress of an upcoming trip to Florida. Tr. 569.  Dr. Brettschneider made an adjustment to her medications. Id.  Schwartz's diagnosis remained the same and she was given a GAF score of 60-65. Id.

Schwartz was again hospitalized on August 1, 2006, for psychiatric symptoms. Tr. 379-380. Prior to the admission Schwartz had become belligerent and threatened to kill her ex-boyfriend and police officers if they came to take her away. Tr. 377-384.  The diagnostic impression was bipolar disorder, current episode manic,

and she was give a GAF score of 10. Tr. 384.  Schwartz remained
hospitalized until August 7, 2006. Tr. 377.  At the time of her
discharge it was reported that she "was alert and oriented to
person, place and time," "[h]er mood was depressed but with
brighter affect," "[s]he [spoke] softly, fluently and with good
eye contact," "[she] showed no motor disturbances," "[s]he denied
any auditory of visual hallucinations," and "[s]he voiced no
active suicidal or homicidal ideations."  Tr. 378.

On August 9, 2006, at which she expressed dissatisfaction with her
medications. Tr. 545-546.  Dr. Brettschneider modified her
medications; the diagnosis was mood disorder, not otherwise
specified, and rule out bipolar affective disorder; and she was
given a GAF score of 50. Id.

Schwartz was again hospitalized from August 30 to
September 7, 2006, for psychiatric problems. Tr. 420-425.
Schwartz had become violent with her husband and destroyed items
in their home. Id.  At the time of admission the diagnosis was
major depressive disorder with suicidal ideation and she was given
a GAF score of 10.  On discharge, Schwartz's mood was dysphoric
but "redirects very well without any difficulties." Tr. 420.

On November 14, 2006, Dr. Brettschneider wrote a letter
to the law firm representing Schwartz in which he stated that he
had been treating Schwartz for bipolar disorder since September,
2004; Schwartz's efforts to return to work had been unsuccessful

17

and on one occasion, precipitated a manic episode that resulted in a hospitalization; and that in his opinion Schwartz was "disabled by chronic mental illness and incapable of working for at least the next year." Tr. 532.

Schwartz had appointments with Dr. Brettschneider on September 18, October 27, November 10, and December 13, 2006, and January 17 and March 7, 2007. Tr. 532, 534-540 and 542-544. In the report of the October 27, 2006, appointment Dr. Brettschneider noted that Schwartz was again hospitalized from October 9, to October 19, 2006. Tr. 542. Dr. Brettschneider continued to treat Schwartz with medications and routinely made adjustments to them. Id. The diagnostic impression was that Schwartz suffered from bipolar disorder with psychotic features and she was given GAF scores ranging from 55 to 60. Id.

On March 28, 2007, Schwartz had an appointment with Dr. Brettschneider at which Schwartz stated that she was doing "okay" but that she was still having racing thoughts. Tr. 823. The diagnostic impression was that Schwartz suffered from bipolar disorder and she was given a GAF score of 60. Tr. 555 and 823. Also on that day, Dr. Brettschneider completed an assessment of Schwartz's work-related functional abilities (entitled "Psychiatric/Psychological Impairment Questionnaire"). Tr. 555-562. In that document Dr. Brettschneider stated that Schwartz was "markedly limited" in her ability to (1) understand and remember detailed instructions, (2) maintain attention and concentration

18

for extended periods, (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, (4) complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (5) get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Tr. 558-560. "Markedly limited" was defined in the document as "effectively precludes the individual from performing the activity in a meaningful manner." Tr. 558.

Schwartz had follow-up appointments with Dr. Brettschneider on April 25, May 29, June 19, August 13, October 8, and December 12, 2007; February 7, July 16, September 15, and November 4, 2008; and January 6, March 20, June 30, July 30, and September 24, 2009. Tr. 803, 805-807, 810-815, 817 and 819-822. The diagnostic impression remained bipolar disorder and there were frequent adjustments to Schwartz's medications. Id.  The GAF scores assessed ranged from 55 to 65. Id.  At a majority of these appointments Schwartz mood was described as either "decent," "reasonably stable," or "okay," Id.  The treatment notes of the March 20, 2009, appointment revealed that Schwartz was hospitalized from March 1, 2009 through March 5, 2009. Tr. 807. The treatment note of the September 24, 2009, appointment revealed that Schwartz was stressed about having to put her grandmother in a nursing home and that Schwartz complained that "no one helps

[her]." Tr. 803.  Schwartz was given a GAF score on September 24th of 60 to 65.  Id.

On October 6, 2009, Schwartz's husband called Dr. Brettschneider's office to report that Schwartz became "panicky" the previous night and made statements about her grandmother having died that were not true.  Tr. 802.  Schwartz had not been sleeping well but refused her husband's suggestion that she go to the hospital.  Id.

Schwartz had a follow-up appointment with Dr. Brettschneider on December 11, 2009.  Tr. 801.  In the notes of that appointment Dr. Brettschneider states that Schwartz had been hospitalized on October 9, 2009, because of stress caused by placing her grandmother in a nursing home.  Id.  The diagnostic impression on December 11th remained the same - bipolar disorder - and Schwartz was given a GAF score of 60 to 65.  Id.  Schwartz was advised to continue taking psychotropic medications.  Id.

At a follow-up appointment with Dr. Brettschneider on March 25, 2010, Schwartz was doing "okay." Tr. 801.  Her grandmother was out of the nursing home and back in an apartment. Id. Schwartz's medications were continued. Id. Her GAF was 60 to 65. Id.

In April and June, 2010, Schwartz's husband called Dr. Brettschneider's office several times and reported that Schwartz was not sleeping well, was stressed, she was having suicidal thoughts, and she was irritable, overwhelmed, anxious, confused

and forgetful.  Tr. 798-799 and 804.  With respect to these phone
calls Dr. Brettschneider made adjustments to Schwartz's
medications.  Id.  With respect to the occasion when Schwartz was
having suicidal thoughts her husband wanted to take her to the
emergency department but by the next day she was doing better. Tr.
804.

Schwartz had follow-up appointments with Dr.
Brettschneider on June 21, July 16, August 9, and October 13,
2010. Tr. 794-797.  The diagnostic impression remained the same
and Schwartz was given a GAF scores of 55 on July 21st and 65 at
the three other appointments. Id.  On June 21st Schwartz
complained of muscle pain and stiffness and blamed that condition
on her medications.  Tr. 797. Her mood was described as
"frustrated with illness." Id. Over the next three months Dr.
Brettschneider adjusted Schwartz's medications and her mood was
described as fine on July 16th,  okay on August 9th, and good on
October 13th. Tr. 794-797.

Just prior to the administrative hearing which was held
on February 11, 2011, Schwartz was hospitalized at the Reading
Hospital and Medical Center in Reading, Pennsylvania from January
20 through February 4, 2011. Tr. 876-878.  Schwartz was referred
to the hospital by her therapist who observed her bizarre
behavior, disorganized thought process, and hypomanic behavior.
Tr. 878.  Initially, Schwartz was uncooperative and refused to
take any medications other than lithium, the dosage of which was

increased to 1800 mg. Tr. 878.  Schwartz eventually agreed to take
Seroquel and once she started on that drug the treating
psychiatrist, Sachidanand Kamtam, M.D., noted that Schwartz's
condition improved and her mood became euthymic. Tr. 876-877  At
the time of discharge on February 4, 2011, Dr. Kamtam described
Schwartz as alert and oriented; Schwartz did not exhibit any
psychomotor abnormality; her speech had a normal rate, rhythm and
volume; her affect was appropriate, mood euthymic, and thoughts
linear and goal-oriented; her insight and judgment were fair; and
she denied any psychotic symptoms or suicidal thoughts. Id.  The
discharge diagnosis was bipolar disorder and Schwartz was given a
GAF score of 55. Tr. 876.  The medications at the time of
discharge, included Lithium carbonate 900 mg by mouth twice per
day and Seroquel 600 mg at bedtime. Id.

     At the administrative hearing on February 11, 2011,
Jeffrey Fremont, Ph.D., a psychologist, testified that Schwartz's
bipolar depression was "successfully controlled" as of February
11, 2011. Tr. 900, 906, 913 and 916-917. Dr. Fremont concluded
that the improvement in Schwartz's condition was the result of the
adjustment to Schwartz's psychotropic medications, which occurred
at her latest hospitalization. Id.  Schwartz's dosage of Lithium
carbonate was increase to 1800 mg per day. Id.  Dr. Fremont
pointed out that initially she was only taking 600 mg per day.
Tr. 916.  Dr. Fremont further testified that initially the
treating psychiatrists were not as aggressive with respect to

treating her condition with lithium. Id. He noted that they only
prescribed 600 mg per day and in his opinion the increased dosage
was the key which brought Schwartz's bipolar depression under
control. Id. At the conclusion of the administrative hearing,
Schwartz did not request that the administrative law judge give
her an opportunity to submit additional medical evidence from Dr.
Brettschneider or any other expert regarding her work-related
mental functional abilities.  Tr. 934.

After the administrative law judge issued his decision,
Schwartz submitted additional medical evidence to the Appeals
Council.  Tr. 887-888.  The additional evidence consists of a
follow-up treatment note by Dr. Brettschneider dated February 21,
2011, and an assessment by Dr. Brettschneider of Schwartz's work-
related functional abilities dated March 18, 2011. Tr. 879-886.
The Appeals Council reviewed this evidence and in finding that it
was not a basis for remand stated as follows:

> You submitted new medical evidence consisting of records
> dated January 28, 2011 to March 1, 2011 from Dr.
> Brettschneider.  These records show that the claimant
> complained of side-effects of her medication, including
> sleeping 10-12 hours a day and excessive tiredness.
> The most recent record from Dr. Brettschneider, dated
> March 1, 2011, reflects a telephone call was made about
> the claimant's Lithium medication, but it does not
> relate that she was still complaining of excessive
> sleep and fatigue.  In addition, the record dated
> February 21, 2011 includes the results of a mental
> status examination which reflect very few abnormalities.
> You also submitted a Psychiatric/Psychological
> Impairment Questionnaire dated March 18, 2011 from
> Dr. Brettschneider, which reflects marked limitations
> in three areas, which would probably preclude work
> activity.  The form also reflects a large number of
> positive clinical findings, but this is inconsistent

23

with Dr. Brettschneider's own office note dated
February 21, 20[11], which reflects very few positive
findings on examination.  The new evidence does not
support a conclusion that the claimant's mental
impairments continued to be disabling or that she has
decompensated since she was discharged from the hospital
on February 4, 2011.

Tr. 729.  Dr. Brettschneider's treatment note of February 21,

2011, reveals that he conducted a mental status examination of

Schwartz and that Schwartz was neatly and casually dressed; her

hygiene was good; her speech mildly pressured; her affect full;

she smiled readily, her mood was euthymic; she was not irritable,

labile or elated; she had no suicidal or homicidal ideations; and

she had no paranoia, delusions or hallucinations. Tr. 887.  Dr.

Brettschneider's diagnostic assessment was that Schwartz suffered

from bipolar disorder and he gave her a GAF score of 55 to 60,

representing moderate symptomatology. Id.

       The medical evidence submitted to the Appeals Council

after the ALJ issued his decision also includes references to

Schwartz's most recent hospitalization which ended on February 4,

2011, as well as information that was relayed to Dr.

Brettschneider's office by Schwartz's husband regarding Schwartz's

condition during and after her hospitalization but before the

administrative hearing. Tr. 889-890.  At the conclusion of the

administrative hearing Schwartz did not request additional time to

present this information.[17]

_____

17.  Schwartz in her reply brief emphasizes a report by her
husband to Dr. Brettschneider on February 7, 2011, that she was
                                              (continued...)

24

**Discussion**

The administrative law judge at step one found that Schwartz had not engaged in any substantial gainful activity since June 14, 2004, the alleged onset date of Schwartz's disability set forth in her applications. Tr. 61 and 758.

At step two, the administrative law judge relying on the testimony of Dr. Fremont found that Schwartz suffers from the following severe impairment: bipolar depression. Tr. 758 and 906. Specifically, the administrative law judge stated as follows:

> The District Court in its order noted that claimant had a number of diagnosed mental impairments and the undersigned did not make a determination as to whether or not those conditions were medically determinable impairments. The undersigned undertook to clarify the impairments by asking the medical expert Jeffrey Fremont, Ph.D. who was present at the hearing, about the numerous diagnoses. Dr. Fremont testified as to the diagnostic picture beginning in 2004, which indicated psychosis [not otherwise specified] and later major depressive disorder. He noted the confusion regarding the exact nature of the mental impairments in that during one seven-day hospital stay there were two different diagnoses in the same day. Nevertheless, based on the records he reviewed, Dr. Fremont stated that the hallucination or what he calls psychotic thinking, is not a schizophrenia or schizoid affective, but rather is secondary to bipolar depression. He stated it was quite common to be bipolar and during manic episodes have psychotic affect. Based on the evidence of record, Dr. Fremont stated that when

---

17. (...continued)
sleeping soundly at night but then three days later on February 10, 2011, her husband reported that she was tired and having difficulty getting motivated. The note, however, goes on to indicate that Schwartz's husband reported that he felt that she was "getting more 'mentally stable' and has been getting her out to walk weather permitting and they're have some fun together." Tr. 890. Schwartz did not have her husband testify at the administrative hearing on February 11, 2011.

> claimant first presented her diagnosis was bipolar
> depression which is now under[] control.  The
> undersigned accepts and gives great weight to this
> opinion as it is consistent with the evidence of
> record. . . .
>
> Based upon Dr. Fremont's testimony and evidence of
> record, the undersigned would therefore find that
> chronic paranoid schizophrenia, chronic PTSD, major
> depressive disorder with psychosis, and dysthymic
> disorder are not medically determinable impairments.
> Rather the severe mental impairment is bipolar
> depression.

Tr. 758.  Dr. Fremont's testimony supports these findings by the
administrative law judge.  Tr. 906-915.

At step three the administrative law judge found that
from June 14, 2004, through February 10, 2011, Schwartz's bipolar
depression was of such severity as to meet Listing 12.04 A and B
of 20 C.F.R., pt. 404, subpt. P, app. 1. The administrative law
judge reached this finding based upon the testimony of Dr.
Fremont. Tr. 905-915.  The administrative law judge then utilizing
the sequential evaluation process outlined at 20 C.F.R. §§
404.1594 and 416.994 determined based on Dr. Fremont's testimony
that medical improvement occurred as of February 11, 2011, which
allowed Schwartz to engage in a limited range of light work.[18] Id.

---

18.  If an administrative law judge at any point finds a claimant
disabled, the administrative law judge must also determine
whether the disability continues through the date of the
decision. In making this determination, the administrative law
judge in DIB claims follows an eight-step evaluation process (20
C.F.R. § 404.1594(f)(1)-(8)) and in SSI claims follows a seven-
step evaluation process (20 C.F.R. § 416.994(b)(5)(i)-(vii)).

At step four of the sequential evaluation process, the administrative law judge stated that commencing on February 11, 2011, Schwartz could engage in light work

> in that she could sit for 6 out of 8 hours in a work
> day; stand for 6 out of 8 hours in a work day including
> normal breaks and work periods; would have the ability
> if required, to walk as part of her job, relatively
> short distances no more than what would be the
> equivalent of a block or two at a time, able to move
> from one location to another in a work setting; can
> not do on a sustained basis a highly complex highly
> detailed job, or in a job where her tasks vary without
> any warning day in [and] day out; can sustain work
> doing 1-2 step occupations simple tasks; is able to
> understand, remember and carry out simple instructions;
> can make simple work related decisions; has the ability
> to respond appropriately to supervision and co-workers;
> can handle changes in routine work setting on a
> routine basis; and would not be able to deal with
> the public in a customer service type setting where
> she handles complaints, however, if the contact
> socially with the public does not involve handling
> complaints and does not involve handling that type of
> stress level, she can appropriately function in terms
> of that level of contact with the public.

Tr. 763.

In finding that Schwartz improved mentally to the point that she no longer met Listing 12.04 and in setting the residual functional capacity the administrative law judge relied on the testimony of Dr. Fremont. Tr. 766.  Dr. Fremont testified that if he saw the claimant in a clinical setting on the day of the administrative hearing he would note in the medical records that Schwartz's bipolar depression was successfully controlled. Tr. 913. He further stated that Schwartz had difficulty dealing with the public directly in a customer service capacity where she had to deal with complaints but that she could

27

do 1-2 step simple tasks and would not have difficulty dealing with supervisors or co-workers. Id.  Utilizing this testimony and the testimony of vocational expert, the administrative law judge found that Schwartz beginning on February 11, 2011, could perform her prior relevant work as a cashier and consequently her disability ended on February 11, 2011. Tr. 767-768.

At the administrative hearing, counsel for Schwartz argued that it was too early to tell if she would remain stable and requested that Schwartz be kept in payment status and a continuing disability review occur in 2 years. Tr. 766 and 925-926.  The administrative law judge in rejecting this request stated as follows:

> In light of Dr. Fremont's testimony and the safeguards and protections afforded by the Social Security Act, the undersigned can not justify such a finding.  The testimony supports medical improvement and limitations have been noted in the residual functional capacity to accommodate claimant's difficulty with concentration, persistence and pace and stress. The vocational expert has testified that the claimant could perform her past relevant work as a cashier.  Dr. Fremont agreed there would be a risk of negative reinforcement to claimant, which could occur with finding continuous disability with a later review.  Moreover, the Social Security Act provides safeguards and protection to the claimant wherein she could be placed back in benefit status if she were to become disabled in the future.  Further, claimant is not precluded from filing a new claim if her condition so warrants. The evidence of record indicates that claimant's medication has been adjusted to the point where improvement has occurred and she is able to function with appropriate restrictions provided for in the residual functional capacity. To rule otherwise would require the undersigned to disregard expert medical testimony, vocational testimony and the testimony of the claimant, all of which supports finding that claimant could perform her past relevant work as a cashier.

Tr. 766-767.

The administrative record in this case is 935 pages in length, primarily consisting of medical records.  The administrative law judge did an adequate job of reviewing Schwartz's medical history and vocational background in his decision. Tr. 754-769.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 10, Brief of Defendant.

Schwartz argues that the administrative law judge improperly relied on the testimony of Dr. Fremont to find that medical improvement occurred on February 11, 2011, and improperly relied on the vocational expert's testimony to find that Schwartz could perform her prior relevant work as a cashier.  In addition, Schwartz argues that the matter should be remanded to the Commissioner to consider new and material evidence.  We have considered these arguments and find that they lack merit.

Schwartz asserts that it was unreasonable to assume that an individual who has had numerous episodes of decompensation due to her mental impairment over a great many years has achieved satisfactory control one week after her discharge from a hospital. The court's inquiry turns not on its own view of the evidence, or whether this court would have weighed the evidence differently, but on whether the administrative law judge's determination is supported by substantial evidence.  Here, the decision is supported by the testimony of Dr. Fremont, a qualified

psychologist, and the administrative law judge properly relied on his testimony concerning whether or not Schwartz met Listing 12.04 as of February 11, 2011.  Furthermore, there is no basis for faulting the administrative law judge's reliance on Dr. Fremont's testimony with respect to Schwartz's functional abilities as of February 11, 2011. The administrative law judge framed a hypothetical question for the vocational expert which was consistent with Dr. Fremont's functional assessment. Consequently, the ALJ properly relied on the vocational expert's answer, i.e., that Schwartz could perform her prior relevant work as a cashier.

Finally, the evidence submitted by Schwartz to the Appeals Council after the ALJ's decision is not a basis to reverse the ALJ's decision or remand for further proceedings. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence.  Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001).  The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).  Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. The Court of Appeals for the Third Circuit explained

that to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. Some of the items submitted to the Appeals Council related to a time after the ALJ issued his decision and, consequently, are not material.  As for the items that relate to the time for which benefits were denied – the husband's observations and Dr. Brettschneider's assertion in the functional assessment of March 18, 2011, that the functional limitations assessed related back to the time for which benefits were denied there is no explanation why counsel did not present a recent functional assessment from Dr. Brettschneider at the administrative hearing or request additional time within which to do so.  Consequently, there is a lack of "good cause" justifying a remand for further proceedings.

An appropriate order follows.

 S/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

Date: January 23, 2014